DEVONSHIRE MILLS CO. v. UNITED STATES

No. 6203.—Invoice dated Mexico, D. F., May 14, 1943.
　　　　　Certified May 14, 1943.
　　　　　Entered at Wilmington, Del., July 1, 1943.
　　　　　Entry No. 1–A.

(Decided August 6, 1945)

Benjamin A. Levett (Benjamin A. Levett and Meyer Ohlbaum of counsel) for the plaintiff.

Paul P. Rao, Assistant Attorney General (Dorothy C. Bennett, special attorney), for the defendant.

OLIVER, Presiding Judge: This case involves the dutiable value of 108 bales of bleached and unbleached cotton cloth exported from Mexico and entered at the port of Wilmington, Del., July 1, 1943, covered by consular invoices dated May 14, 1943.

The bleached cotton cloth (No. 666) was invoiced at $1.73 Mex. per meter plus certain charges, entered at $1.73 Mex. plus packing and invoice stamps and appraised at $2.14 Mex. per meter. The unbleached (No. 444) was invoiced at $1.50 Mex. per meter plus certain charges, entered at $1.50 Mex. plus packing and invoice stamps and appraised at $1.80 Mex. per meter.

Upon arrival in Wilmington the car containing the merchandise was shifted to the siding of Joseph Bancroft Sons & Co., who were finishers, manufacturers, and dyers of this class of material. The superintendent of their bleaching department (Mr. Nauman) testified that on arrival in the latter part of July 1943 (R. 28), his attention was called by one of his workmen to certain defects or imperfections in the merchandise (R. 29) and that he personally examined about 15 or 20 per centum of the entire shipment (R. 37) and found what he described as mill oil spots, hanging threads, holes in the cloth, poor selvage and selvage markings which were not fast color and would run during processing (R. 31, 32). He estimated that 25 per centum of the goods he examined had such imperfections (R. 37).

A representative of the Devonshire Mills (Frank C. Distler, vice president) testified that he went to Wilmington in the early part of

August 1943 and examined about four or five bales, the exact yardage not being stated, and he noted the imperfections above referred to and "saw that the goods were in a frightful condition, in such a condition that I was flabbergasted" (R. 44), they were "all no good" (R. 51), but authorized the finishers to proceed to process the goods, which they did. Subsequently, Bancroft shipped this material out direct to plaintiff's customers on orders which presumably had been previously taken. The witness stated that in at least two instances he had complaints, and in one instance involving in the neighborhood of 60,000 yards, he was compelled to take back and resell the material (R. 46, 47).

The record does not make clear the exact reasons why the plaintiff's customers complained about the merchandise shipped to them. The cloth they received was not in the condition in which it was imported. It had been processed and bleached and finished in whites or in color after importation. It was this processed material that was shipped to plaintiff's customers. It may have been unsatisfactory to the purchasers for any number of reasons, but it does not appear that complaints were based on the defects alleged to have been contained in the bleached and unbleached merchandise as imported. The record does not contain any samples of the material in its finished condition as shipped to plaintiff's customers.

The plaintiff endeavored to show that the imported merchandise was below standard, but no standard for the Mexican bleached and unbleached cotton cloth was established and no samples other than the Government samples taken from this shipment are in evidence (collective exhibits 2 and 3). These official samples do not indicate any such defects and imperfections as were described by the witnesses for the plaintiff and there are no samples before me illustrating the alleged inferior and imperfect merchandise described in the testimony.

Mr. Wallenstein, treasurer of the Devonshire Mills, testified that while he was in Mexico he looked for a quality of goods that would answer "our purposes in the States." He thought he had found such from a sample shown him by the vendor of these goods and made the purchase as indicated on the invoice. Upon making inquiries, Mr. Wallenstein found several Mexican firms selling this kind of merchandise freely at about the same prices, but they did not all have it for immediate delivery. He stated that there was no difference in the price for export or for home consumption (R. 11, 12).

Prior to the shipment of the goods under consideration, plaintiff's representative in Mexico, Isidoro Ruiz, negotiated with the same manufacturer for an additional lot of the identical merchandise. This second order was finally placed about May 29, 1943, at higher prices. The terms of payment on this second order were by an irrevocable

letter of credit, expiring August 1, 1943, which was extended until August 20, 1943. At the trial of the present case, Mr. Distler testified that he did not give the exporter the real reason for canceling this second order, which actually was dissatisfaction over the quality of the merchandise received on the first order, since he feared the seller would make immediate shipment and present shipping documents against the irrevocable letter of credit. He therefore notified the seller that the reason for the cancellation was the seller's failure to make delivery on time. A copy of his telegram (part of collective exhibit 5) to the manufacturer, dated August 31, 1943, reads: "Delay in shipment has caused us great embarrassment and compelled our customers to cancel orders therefore we regret we cannot accept shipment at this late date."

Thereafter, as appears from Treasury agent's report (collective exhibit 5), under date of September 14, 1943, plaintiff wrote to the seller, setting forth in detail the reasons for the cancellation of this second order. This explanation was made at a time long after the first shipment had arrived and its actual condition ascertained and at a time after the extended irrevocable letter of credit had expired (August 20). In this letter, plaintiff stated in part:

On August 1, we received a telegram from Mr. Ruiz advising that the goods had not been shipped and that we should extend letter of credit to August 20th. This we did very willingly and then went to our customers and told them there was a slight delay but that the goods would be shipped without fail on or before August 20th from Mexico. It was understood between customers and ourselves that at that time if the goods were not shipped on August 20th, we would accept cancellation. We agreed, hoping the goods would be shipped long before August 20th. * * * Therefore, while the situation is very much to be regretted, we must ask you to accept our cancellation *because of your delivery being delayed to such a great extent*. [Italics supplied.]

Early in August, plaintiff had examined the present merchandise and claims to have found it of inferior quality. On August 20 plaintiff's irrevocable letter of credit expired and it seems that immediate cancellation could have been made without any fear that the letter of credit would be used.

It is not disputed that at the time the goods in question here were exported from Mexico there was in existence the second order, which had not yet been canceled. In fact counsel for plaintiff admits "that the price on the day the goods were shipped, the offered price was as the appraiser reports" (R. 7).

There is no standard before me with which to compare the imported merchandise. It may well be that all cloth of this type shipped from Mexican mills has certain imperfections. Moreover, on August 30, 1943, a date subsequent to the receipt and inspection of the merchandise at bar, Mr. Distler, answering under oath a questionnaire regarding this importation sent to his firm by the local appraiser,

replied "Yes" to the question, "Is the merchandise of standard quality?" (collective exhibit 1–A).

This is not a case where first quality goods were ordered (no order is in evidence), second quality shipped, and claim made against the manufacturer with a resulting admission and price allowance made by the manufacturers, as was the situation in *United States* v. *Marks & Rosenfeld, Inc.*, Reap. Dec. 4432, 1 Cust. Ct. 704. It also appears that this merchandise was not changed in condition and value between the date of exportation and date of importation, as was the situation in *American Sugar Refining Co.* v. *United States*, 181 U. S. 610. It is clear that this material was received in the condition in which it was shipped.

On this record I am of opinion that the plaintiff has failed to sustain its burden of proof. It is claimed that this importation contained certain imperfections that reduced its value. The plaintiff has failed to prove the Mexican "standard" of quality for these goods or by what degree if any this merchandise, in its imported condition, differs from such "standard," or the market value in Mexico for "sub-standard" merchandise, if such existed.

Even if plaintiff had sustained its burden of establishing that the appraised values were erroneous or incorrect, it has failed to support its burden of establishing values for this merchandise other than the appraised values.

I therefore find the export value, as such value is defined in section 402 (d) of the Tariff Act of 1930, to be the proper basis for the determination of the value of the involved merchandise, and that such values are the presumptively correct values found by the appraiser.

Judgment will be rendered accordingly.